CARSON CITY GOLD & SILVER MIN. CO. v. NORTH STAR MIN. CO.

(Circuit Court of Appeals, Ninth Circuit. October 18, 1897.)

No. 341.

1. PATENTED MINING CLAIMS—CONSOLIDATED CLAIMS—EXTRALATERAL RIGHTS—
   CONCLUSIVENESS OF PATENT.
   The issuance of a patent for a claim made up of several claims acquired
   by purchase is conclusive that the parties named therein as grantees were
   the owners, not only of the surface ground described, but of any vein in-
   cluded therein, to the extent that its apex is found within the exterior
   boundaries, and of all rights and privileges incident thereto; that the several
   locations included in the patent had been properly made in accordance with
   law, including a discovery of the lode; and that the amount of work required
   by law had been performed thereon.

2. SAME—EXTRALATERAL RIGHTS.
   The owner of a claim patented under the act of 1866, and made up by the
   consolidation of several claims acquired by purchase, is entitled to extra-
   lateral rights in respect of any lode or vein whose apex is found within its
   exterior boundaries, without regard to the location of the interior lines which
   formed the boundaries of the original claims. 73 Fed. 597, affirmed.

3. SAME.
   A patent for a consolidated claim, issued under the act of 1866, is not void
   merely because the ground patented exceeds the 300 feet in width allowed by
   Rev. St. § 2320, in the case of any one location, but varies in width from 650
   to 1250 feet. Lakin v. Dolly, 53 Fed. 333, and Lakin v. Roberts, 4 C. C. A.
   438, 54 Fed. 462, distinguished.

4. SAME—IRREGULAR SHAPE OF CLAIM—EXTRALATERAL RIGHTS.
   A patent issued upon an application filed under the act of 1866 entitles the
   owner to extralateral rights in any vein or lode whose apex is found within
   the patented boundaries, without regard to whether such boundaries are in
   form of a parallelogram. If the end lines of such a claim converge in the
   direction of the dip of the vein, the owner of an adjoining claim cannot com-
   plain of the lack of parallelism, since the effect is to limit the extralateral
   rights so as to give the patentees less of the vein or lode in depth than they
   have at the surface.

In Error to the Circuit Court of the United States for the Northern
District of California.

This is an action of trespass brought by the plaintiff in error, as owner of
the Irish-American mining claim, situated in Nevada county, Cal., against the
defendant in error, which, as the owner of the North Star claim, has followed
and worked its lode upon its descent under the surface of the Irish-American
claim. Both claims are patented, and each claim, as patented, is a consolida-
tion of a number of small claims, many, if not all, of which were located long
prior to the enactment of any mining law by congress, and was patented in the
irregular shape, and of the unusual size, represented upon the diagram herein-
after inserted. The questions presented by the writ of error are based upon the
alleged insufficiency of the findings of the circuit court to support the judgment
rendered in favor of the defendant in error. The cause was tried before the court
without a jury. The court found, among other things, that: (3) On or about
December 7, 1877, the government of the United States, in pursuance of the
provisions of chapter 6, tit. 32, of the Revised Statutes of the United States,
issued and delivered its patent to one Michael McDonough, conveying the
mining ground and claim situate in Grass Valley mining district, county of Ne-
vada, and state of California, known as and called the "Irish-American Mine,"
described as follows: Lot 68 in township 16 N., range 8 E., and lot 53 in town-
ship 15 N., range 8 E., Mount Diablo meridian,—in the official plats of the

mineral surveys of the government of the United States. That said patent was issued subject to the following conditions and stipulations, to wit: "First, that the grant hereby made is restricted to the land hereinbefore described as lots Nos. 53 and 68, with twenty-three hundred and seventy-six and sixty-six hundredths linear feet of the Irish-American quartz mine, vein, lode, ledge, or deposit, for the length aforesaid, throughout its entire depth as aforesaid, together with all other veins, lodes, ledges, or deposits, throughout their entire depths as aforesaid, the top or apex of which lies inside the exterior lines of said survey; second, that the premises hereby conveyed, with the exception of the surface, may be entered by the proprietor of any other vein, lode, ledge, or deposit, the top or apex of which lies outside the exterior limits of said survey, should the same, in its downward course, be found to penetrate, intersect, extend into, or underlie the premises hereby granted, for the purpose of extracting such other vein, lode, ledge, or deposit." (4) That on the 26th day of June, 1894, the plaintiff in this action became the owner of said Irish-American mine, as described in finding 3, by mesne conveyances from said patentee, and ever since said last-named date has been, and now is, the owner, in possession, and entitled to the possession, of, all and singular, said property. (6) That at all times mentioned in plaintiff's complaint, and for more than 30 years prior to the commencement of this action, the defendant, North Star Mining Company, its predecessors and grantors, were the owners in possession, and entitled to the possession, of all that certain mine and mining claim situate in Grass Valley mining district, Nevada county, state of California, known as and called the "North Star Mine," a particular description of the metes and bounds of said claim being contained in said finding, containing "sixty-five (65) acres and fifteen-hundredths ($15/100$) of an acre of land, more or less." (8) That said North Star mine of defendant is situated in a southerly direction from the Irish-American mine of plaintiff, the north boundary of said North Star mine being at an average distance southerly from the south boundary of said Irish-American mine 430 feet. The end lines of said North Star mine are as follows: The course called for in the description contained in finding 6, between stakes N. S. No. 1 and N. S. No. 2, N., 15° E., 14.97 chains, is the west end line of said North Star mine: and the course connecting stake N. S. No. 4 with N. S. No. 5, S., 30' W., 10 chains and 30 links, is the east end line of said claim. Said end lines are not parallel, but converge in the direction of the dip of the North Star ledge, hereinafter mentioned. That within the surface boundaries of said North Star mine, as hereinbefore described, there is a ledge of rock in place, known as and called the "North Star Ledge"; and, to the extent hereinafter specified, said ledge has its top or apex wholly within said surface boundaries. That the general course or strike of said ledge is N., 81° 15' W., or S., 81° 15' E., and the top or apex thereof traverses approximately the center of said (patented surface area of said North Star) mine. On its eastward course it crosses said east end line at a point thereon distant 200 feet northerly from the stake marked "N. S. No. 5," referred to in the description contained in finding 6. On its westward course, said top or apex of said ledge, so far as hitherto developed and established, continues to a point 2,200 feet from the east end line, measured on the course or strike N., 81° 15' W., which said point, for the purpose of identification and reference, is hereby designated as the western terminus of said top or apex of said ledge. (9) "That the title of said defendant to said North Star mine and said North Star ledge is as follows: On September 15, 1869, and for many years prior thereto, the North Star Gold-Mining Company, the immediate predecessor in title of said defendant, was, as against every one save and except the government of the United States, the owner of said North Star ledge, with the right to follow the same to any depth on its downward course into the earth. That on said September 15, 1869, and under and by virtue of the provisions of an act of congress entitled 'An act granting the right of way to ditch and canal owners over the public lands and for other purposes,' of July 26, 1866, said North Star Gold-Mining Company made application to the government of the United States to enter and receive a patent for said ledge, together with so much of the surface ground adjoining the same as was reasonably necessary for the purpose of working said ledge, and as was authorized by the local rules and regulations of miners which were then in force in the locality where said ledge was situated. That thereafter, in pursuance of

said application so made, and on August 11, 1875, the government of the United States issued its patent to said North Star Gold-Mining Company, conveying. all and singular, said North Star mine, as described in finding 6, together with said North Star ledge, throughout its entire depth, together with all other veins, lodes, ledges, and deposits, throughout their entire depth, the tops or apices of which lie inside of the exterior lines of said mine as hereinbefore described. (That said North Star claim was originally composed of a number of smaller claims, which were consolidated into one patent, as the North Star claim, and that the lines, exact locality, or area of such original claims were not shown upon the trial, except so far as the patented lines of the North Star patent establish, or tend to establish, such facts.) That thereafter, and on or about June 16, 1884, said North Star Gold-Mining Company sold and conveyed all of said property to the defendant herein, which thenceforward has continued to be, and now is, the owner thereof." (10) That said North Star ledge descends into the earth in a northerly direction, and at an angle of about 25° from the horizon, and, in its downward course, passes outside of the planes drawn vertically through the north side line of said North Star mine, and enters the land adjoining, and reaches, penetrates, extends into, and underlies the said Irish-American mine, the property of the plaintiff herein. (11) That upon said ledge, at a place therein within the boundaries of said North Star mine, defendant and its grantors and predecessors in title have sunk an inclined shaft, and extended the same to the present depth of 2,600 feet or thereabouts, and by means of said shafts and drifts, levels and stopes extended therefrom, in said ledge, have for more than 30 years last past been engaged in extracting and removing from said ledge ore and mineral-bearing rock therefrom. That for more than 25 years next preceding the commencement of this action, with the full knowledge of the owners of said Irish-American mine described in said plaintiff's complaint, the defendant and its grantors have been in possession of and working said North Star ledge, and extracting and removing ore and mineral-bearing rock therefrom, underneath the surface of said Irish-American mine, by means of said inclined shafts, drifts, levels, and stopes. That all of said work and extraction and removal of ore and material by said defendant and its grantors have been upon said ledge (which has its apex wholly within the lands and premises of defendant) hereinbefore described, and all of the mineral deposits heretofore or now appropriated by any of said underground works of said defendant are parts of said ledge. That the defendant never at any time entered upon the lands or premises described in plaintiff's complaint as the "Irish-American Mine," or any portion thereof, except upon and in the lawful pursuit of and following its said North Star ledge on its downward course as it penetrates into said premises described in said complaint, underneath the surface thereof, as hereinbefore set forth. That substantially all of the excavations, openings, drifts, and other works made by the defendant underneath the surface of said Irish-American mine lie between vertical planes drawn through the east end line of said North Star mine, as hereinbefore described, and said line produced indefinitely in its own direction, and another similar plane, parallel to said east end line, crossing said North Star mine at the point fixed in finding 8 as the western terminus of the top or apex of said ledge; said point being at a distance of 2,200 feet N., 81° 15′ W., along the general course of the vein, measured from the point on said east end line where said ledge crosses the same as set forth in said finding 8. (13) The court finds that there is a fissure, or at least a distinct line or change in the geological formation of the country, called in this case a "crossing," which runs nearly north and south through the mine; that its underground course is approximately indicated by the westerly ends of the several levels and workings; that its location upon the surface is not clearly located; that while the workings on the 1,800-foot level extend west of it very little, if any, ore has been found there, and the workings of the mine, with some unimportant exceptions, sustain plaintiff's contention that this crossing marks, the western limit of the ledge. (14) The court finds that the course and relative position of the various levels and workings of the mine, so far as shown by the testimony, are approximately represented in the copy of defendant's exhibit 8, which is hereto attached as a part of this finding, and is as follows:

Upon the foregoing facts the court found, as conclusions of law: (1) "That the defendant had a right to pursue and follow its North Star ledge on its downward course to any depth underneath the surface of said Irish-American mine within vertical planes drawn through its east end line of said North Star mine and said line produced indefinitely in its own direction, and a similar parallel plane crossing said North Star mine at a point designated in these findings as the 'western terminus' of the top or apex of said ledge, which point is distant 2,200 feet north, 81° 15′ W., measured from the point on said east end line where said North Star ledge crosses the same on its onward course: provided, however, that in no event shall the defendant be permitted to pursue its ledge west of a perpendicular plane extended through the west end line of said North Star mine and said line produced indefinitely in its own direction." (2) "That the entry by defendant underneath the surface of said Irish-American mine was lawful, and in virtue of the right and ownership of said defendant in said North Star mine and said North Star ledge; that no trespass has been committed upon the property rights of plaintiff; and that said plaintiff has suffered no damage by reason of any of the acts or things done or suffered by said defendant." (3) "That the defendant is entitled to a judgment for its costs."

Dickson, Ellis & Ellis, for plaintiff in error.
Curtis H. Lindley and Henry Eickhoff, for defendant in error.

Before GILBERT and ROSS, Circuit Judges, and HAWLEY, District Judge.

HAWLEY, District Judge (after stating the facts).   Do the findings of facts sustain the conclusions of law arrived at by the court? Is the defendant entitled, under the facts as found by the court, to any extralateral rights?   Was it necessary for the defendant to prove the lines of its various locations comprising the area covered by the patent, or was it sufficient for it to show the existence of a vein or lode, with the dip and strike of that vein or lode within the surface boundaries of the North Star claim as patented?   It is argued by plaintiff that section 2322, Rev. St. U. S., refers exclusively to the extralateral rights pertaining to a single location; that the idea of extralateral rights arising out of a number of consolidated locations was not within the contemplation of congress when said statute was adopted.    This statute reads as follows:

"The locators of all mining locations heretofore made or which shall hereafter be made, on any mineral vein, lode, or ledge, situated on the public domain, their heirs and assigns, where no adverse claim exists on the tenth day of May, eighteen hundred and seventy-two, so long as they comply with the laws of the United States, and with state, territorial and local regulations not in conflict with the laws of the United States governing their possessory title, shall have the exclusive right of possession and enjoyment of all the surface included within the lines of their locations, and of all veins, lodes and ledges throughout their entire depth, the top or apex of which lies inside of such surface lines extended downward vertically, although such veins, lodes, or ledges may so far depart from a perpendicular in their course downward as to extend outside the vertical side-lines of such surface locations.  But their right of possession to such outside parts of such veins or ledges shall be confined to such portions thereof as lie between vertical planes drawn downward as above described, through the end lines of their locations, so continued in their own direction that such planes will intersect such exterior parts of such veins or ledges.  And nothing in this section shall authorize the locator or possessor of a vein or lode which extends in its downward course beyond the vertical lines of his claim to enter upon the surface of a claim owned or possessed by another."

It is not denied that the defendant might purchase all the various locations comprising its patented area of 65 acres, covering one or more lodes or veins, and that, being the owner thereof, it might obtain from the United States a patent covering all the ground embraced in the original locations.   But plaintiff contends:

"That no applicant for a patent, by pursuing this method, leaving out all boundary lines, end lines, and side lines of the various locations composing the consolidated claim, by obliterating on paper all traces of boundaries of the locations, and thereby all evidence of extralateral rights, can thereby secure extraordinary rights which he did not possess before. * * * It is the location, and the manner of it, through which the extralateral right is derived.  That location may ripen into a patent, and its lines be finally fixed and determined in and by the patent; and if correctly laid upon the surface, and evidenced by the patent, and a vein passes through the end lines of it, or, say, one end line, he may have, as to that vein, extralateral rights. * * * If the boundaries of the several locations comprising the aggregate amount applied for and patented do not appear in the patent, but only the exterior boundaries of the entire aggregated tract, then surely the patentee, if he claim the extralateral right as to any vein, the apex of which is found within the surface of his aggregate tract, should be held to establish by proof where some location was, and how it was laid upon the ground, or be denied the extralateral right."

Can this contention be sustained?   The precise point here involved has never been discussed in any of the decided cases to which

our attention has been called. We are of opinion that the defendant was not required to show the separate lines of any of the original locations embraced within the surface boundaries of its patented claim. It was enough for it to show that a lode running in an easterly and westerly direction, and having its apex within the surface boundaries of the patented ground of the North Star, extended, in its dip downward, into the workings of the Irish-American ground owned by the plaintiff in error, and that all its acts complained of by the plaintiff were in extracting ore from such lode "extended downward vertically," within its side-line planes, beneath the patented lines of the Irish-American ground. It is true that the burden was upon the defendant to show by a preponderance of evidence that the ore which it extracted from beneath the patented surface ground of the plaintiff belonged to the lode or vein, the apex of which was within the surface lines of its own patented ground. Duggan v. Davey, 4 Dak. 110, 122, 26 N. W. 887, 891; Leadville Co. v. Fitzgerald, Fed. Cas. No. 8,158; Doe v. Mining Co., 54 Fed. 935, 937; Consolidated Wyoming Gold-Min. Co. v. Champion Min. Co., 63 Fed. 540, 551. But this burden is met and overcome by the undisputed facts, found by the court, that the defendant was the owner of and in possession of the entire apex of the lode within the boundaries of the North Star patented mine, and its continuity and identity in its dip downward vertically beneath the Irish-American ground. It was unnecessary to go further, by proving the lines of one or more or all of the locations as originally made. When the patent was issued the owner thereof became entitled, not only to such lodes as had been previously located, but to all other "veins, lodes and ledges throughout their entire depth, the top or apex of which lies inside of such surface lines extended downward vertically, although such veins, lodes or ledges may so far depart from a perpendicular in their course downward as to extend outside the vertical side lines of such surface locations." If, therefore, any lode, as located, or any other lode thereafter found within the surface location, runs in an easterly and westerly direction between the end lines lengthwise, and on its downward dip extended into the earth beneath the Irish-American claim, this would be sufficient to authorize the judgment in favor of the defendant. The extralateral right conferred by the statute is but an incident of a valid lode location.

There are certain presumptions in favor of patents regularly issued by the government for mining ground, which have more or less application to the question at issue here. These presumptions must not be overlooked. When the patent to the North Star mine was issued, it was conclusive that the parties named therein as grantees were the owners, not only of the surface ground, but of 3,140 linear feet in length of any lode, if so much thereof should be found within said surface boundaries, and of all rights and privileges incident thereto; that the several locations included therein had been properly made in accordance with the law, including a discovery of the lode; and that the amount of work required by law had been performed thereon. Then comes the statute which secures to the patentee, not only

the surface ground, with a lode and vein having its apex therein, but gives to him the extralateral right to follow such lode or vein downward into the earth as therein expressed. Such is the natural deduction to be drawn from the principles announced in the following, as well as other, cases: Smelting Co. v. Kemp, 104 U. S. 636, 646; Steel v. Refining Co., 106 U. S. 447, 1 Sup. Ct. 389; Tucker v. Masser, 113 U. S. 203, 5 Sup. Ct. 420; Davis' Adm'r v. Weibbold, 139 U. S. 507, 11 Sup. Ct. 628; Kahn v. Mining Co., 2 Utah, 175, 198; Talbott v. King, 6 Mont. 76, 104, 9 Pac. 434; Chambers v. Jones, 17 Mont. 156, 162, 42 Pac. 758; Mining Co. v. Campbell, 17 Colo. 267, 272, 29 Pac. 513; Mining Co. v. Lee, 21 Colo. 260, 40 Pac. 444; Doe v. Mining Co., 54 Fed. 935, 940; Book v. Mining Co., 58 Fed. 106, 128; Eureka Consol. Min. Co. v. Richmond Min. Co., 4 Sawy. 302, 319, Fed. Cas. No. 4,548.

In Talbott v. King the court said:

"The issuance of the patent conclusively proves all these precedent acts and facts which the land department must find to exist before the patent can rightfully issue. The act of the department, therefore, in issuing a patent, is an adjudication, and, like a judgment, is final as to all matters necessarily included in and determined by it. What, then, does a patent to a mining claim prove? (1) That the lands bounded and described therein are mineral lands; (2) that a discovery and location within said boundaries has been made according to law; and (3) that the necessary amount of work has been performed thereon, and that all preliminary and precedent acts necessary in order to authorize and justify the issuance of the patent have been performed as the law requires. The issuance of a mining-claim patent proves that there was a discovery and location according to law."

In Smelting Co. v. Kemp the court said:

"A patent, in a court of law, is conclusive as to all matters properly determinable by the land department, when its action is within the scope of its authority; that is, when it has jurisdiction, under the law, to convey the land. In that court the patent is unassailable for mere errors of judgment. Indeed, the doctrine as to the regularity and validity of its acts, where it has jurisdiction, goes so far, that if in any circumstances, under existing law, a patent would be held valid, it will be presumed that such circumstances existed."

In that case the defendant contended that a patent could not be issued for a placer mining claim which embraced over 160 acres, and the court held that the patent might include as many adjoining locations as the patentee had purchased, and that the proceedings to obtain a patent therefor were the same as when the application covered but one location. Among other things, the court said:

"There is nothing in the reason of the thing, or in the language of the acts, which prevents an individual from acquiring by purchase the ground located by others, and adding it to his own. * * * His claim may include as many adjoining locations as he can purchase, and the ground covered by all will constitute what he claims for mining purposes, or, in other words, will constitute his mining claim, and be so designated. Such is the general understanding of miners, and the meaning they attach to the term. * * * If one individual should acquire all such contiguous claims by purchase, no sound reason can be suggested why he should not be equally entitled to enter them all by one entry, as when they were held by the original parties. * * * It was therefore very natural, when patents were allowed, that the practice of presenting a single application with one survey of the whole tract should prevail. It was at the outset, and has ever since been, approved by the department, and its propriety has never before been questioned."

This language is certainly as applicable to the location of lode claims as to placer claims.

In Mining Co. v. Campbell, supra, the court declared that there could be no higher evidence of title than a patent from the United States, and that, in favor of the validity and integrity of such an instrument, it must be presumed that all antecedent steps necessary to its issuance were duly taken. As was said by Mr. Justice Field in the Eureka Case:

"A patent of the United States for land, whether agricultural or mineral, is something upon which its holder can rely for peace and security in his possessions. In its potency, it is ironclad against all mere speculative inferences."

And in Chambers v. Jones, supra, the court held that, after the issuance of a patent to a mining claim, the sufficiency of the location notice cannot be questioned.

These general principles are amply sufficient to sustain the ruling and decision of the lower court. Any other conclusion might result in making invalid many patents heretofore issued upon consolidated locations. Especially would this be true if plaintiff's contention should be sustained, that every presumption must be construed against the patent. A patent from the government would be of but little, if any, use or effect, if the duty devolved upon the patentee, whenever the validity of his claim is called in question, to prove that each separate location was properly made in strict conformity with the law. One purpose, object, and effect of procuring a patent is to at once and forever settle this question, and set at rest all further contests in relation to such matters. As was said by the court in Doe v. Mining Co., 54 Fed. 935, 940:

"If questions relating to the boundaries of the location, the marking of them, the discovery of a vein, lode, or ledge within them, the posting of the required notice, etc., are open to contestation after the issuance of a patent for the claim, as before, the issuance of such an instrument would be a vain act, and would wholly fail to secure to the patentee the rights and privileges designed by the law authorizing its issue. The very purpose of the patent is to do away with the necessity of going back to the facts upon which it is based."

Of course, patents may be set aside on the ground of fraud, or in cases where it appears upon the face of the patent that it was issued in a case not authorized by law. But in this case the plaintiff expressly denies making any attack upon the patent, and admits its validity, binding force, and conclusiveness, as to all the ground within the surface boundaries of the patented lines. If good for the veins and lodes found within the surface boundaries, does not the statute, in direct terms, give the right to follow such veins and lodes in their downward course? If there was but one location upon which a patent was obtained for a piece of surface ground 1,500 feet in length and 600 feet wide, 300 feet on each side of the lode, would it be necessary for the owner of the ground, after introducing his patent, to prove up his original location, the lines and bounds thereof, in order to entitle him to receive all the rights and privileges given him by the statute? Certainly not. His patent, with the additional fact of proving the existence of a lode, with its course and dip, would be all that the law requires. Now, if the patent is for a lode 3,000 feet

in length, would it be necessary to show that there were two locations, and the lines and bounds of each? Should this right be denied on the ground that it is possible to draw imaginary lines, so as to show that, if the locations were made in the way imagined, the lode would cross the end or side lines in such a way as to prevent the defendant from having any extralateral rights beneath the plaintiff's surface ground? Are courts compelled to give heed to such arguments, and indulge in such wide fields of speculation? If any presumptions are to be indulged in, should not the court presume that the several locations were made in such a manner as to include the lode lengthwise, as it is actually proven to be, within the surface lines of the patented location?

So far, in the discussion of the question herein involved, it has been assumed that the several mining locations were made in the manner and form prescribed by the acts of congress of 1872, by taking up a piece of ground described by metes and bounds, in the form of a parallelogram. But the locations were not made under the provisions of the act of 1872. It is alleged in the answer:

"That continuously for more than forty years last past this defendant, and its grantors and predecessors in title, have been, and defendant now is, the owner, in the possession of, and entitled to the possession of, 3,140 linear feet of that certain lode or ledge of rock, in place, carrying gold and silver, situate, lying, and being in the township of Grass Valley, Nevada county, state of California, formerly known as and called the 'French Lead,' and now known as and called the 'North Star Ledge.'"

The locations must therefore have been made prior to any acts of congress, and were governed solely by the rules and regulations adopted by the miners of the district where the lode in question was situated. They were not required to be made in the form of a parallelogram, taking up any specific quantity of surface ground. The lode was the principal thing which the miners sought, discovered, and located, with all its dips, spurs, and angles. The location was made for a given number of feet of the lode, and the locators were entitled, under the local rules, laws, and customs of miners, to the number of feet claimed on the lode, in whatever direction or course it was found. There was no question raised as to any side lines, for there were none. The locators were allowed a number of feet of surface ground on each side of the lode, sufficient for the convenient working of the same. As was said by the court in Golden Fleece G. & S. Min. Co. v. Cable Consol. G. & S. Min. Co., 12 Nev. 312, 328:

"The claim was defined by the terms of the notice, and not by posts and monuments erected on the surface of the earth. The notice claimed so many feet of the vein, with the adjacent surface. If subsequent developments demonstrated that the course or strike of the vein differed from that mentioned in the notice, the locator was still allowed to follow the vein to the extent claimed, because there was no difficulty in reconciling the description in the notice with the deflection in the vein from its apparent course at the discovery point, and because the claim in fact was of so much of the vein, wherever it might run. As the surface ground allowed by the miners' rules was a mere incident to the vein, and was to be adjacent to it, and was never marked by posts or monuments, any more than the vein itself, it followed, as a matter of course, that when the true course of the vein was discovered the surface ground was located in conformity to it."

See, also, Walrath v. Mining Co., 63 Fed. 552, 556.

These regulations and customs of the miners were sanctioned and approved by the legislatures of the states, sustained and enforced by the courts, until 1866, when congress took the first step authorizing the sale of the public mineral lands, by enacting a law declaring that such lands were free and open to exploration and occupation by citizens, and others who had declared their intention to become such, subject only to such regulations as were or might be prescribed by law, and the local rules, regulations, and customs of miners, not in conflict with the constitution or laws of the United States. Nothing is contained in the act of congress which in any manner interferes with the validity of the previously acquired rights of the miners under the local rules, customs, etc. On the contrary, it was expressly provided:

"That whenever any person or association of persons claim a vein or lode of quartz, or other rock in place, bearing gold, silver, cinnabar, or copper, having previously occupied and improved the same according to the local customs or rules of miners in the district where the same is situated, and having expended in actual labor and improvements thereon an amount of not less than one thousand dollars, and in regard to whose possession there is no controversy or opposing claim, it shall and may be lawful for said claimant or association of claimants to file in the local land office a diagram of the same, so extended laterally or otherwise as to conform to the local laws, customs, and rules of miners, and to enter such tract and receive a patent therefor, granting such mine, together with the right to follow such vein or lode with its dips, angles, and variations, to any depth although it may enter the land adjoining, which land adjoining shall be sold subject to this condition." 14 Stat. 251.

It was in this condition of the law that the grantors of the defendant, in September, 1869, applied for a patent for 3,140 linear feet of said North Star ledge, which application remained unacted upon until after the passage of the act of May 10, 1872, and until August 11, 1875, when the government of the United States issued its patent granting to the North Star Gold-Mining Company the land set forth in the diagram, to wit, 3,140 linear feet of said North Star quartz ledge, throughout its entire depth, together with all other veins and lodes, ledges and deposits, throughout their entire depth, the tops or apices of which lie inside the exterior lines of the patented ground. Upon these facts, it cannot, in the light of reason, or upon the authority of any decided case, consistently be said that the defendant having title to the North Star lode under this patent is not entitled to any extralateral rights, because it did not prove the boundaries of one or more of the original locations of the ground included in the diagram. In the light of all the findings, we have the right to presume, in the absence of any proof to the contrary, that the original locations were made along the lode lengthwise, and that when the patent was applied for a survey of the surface ground was made, and the surface boundaries were marked upon the claim, which consisted of several locations, the lode claim, as thus patented, was thereby limited in extent to the survey of the surface ground, and the owner of the claim, as thus patented, had no right, under the act of 1866 or of 1872, to follow the lode lengthwise beyond the surface lines of the patented claim. But for so much of the lode as has its apex

within the surface limits, as found within the end lines of the patented ground, the extralateral rights were granted to the patentee in express terms. It therefore follows that when the defendant introduced its patent, proved the course of the lode lengthwise within the surface limits of the patented ground, and that all the ore which it had extracted from beneath the surface ground of the Irish-American claim was taken from said lode, as set forth in the findings, it clearly, and beyond all question, established its right to the ores thus taken out. No further proofs were required.

2. It appears from the patent, and is shown in the diagram, that the mining ground patented varies in width from 650 to 1,250 feet, and it is therefore claimed by plaintiff in error that the patent is void upon its face; and Lakin v. Dolly, 53 Fed. 333, and Lakin v. Roberts, 4 C. C. A. 438, 54 Fed. 462, are cited and relied upon in support of this contention. Every case must be considered with reference to its own peculiar facts. The Lakin Cases did not involve any construction of the law appertaining to the extralateral rights of the lode patented to the Mammoth Gold-Mining Company. The lode, neither in its length or depth, was involved. It was only the surface ground that was in dispute. The patent in those cases embraced two separate mining locations, and conveyed 4,100 feet of a gold-bearing quartz lode, with 252.95 acres of land. The lode, as located and fixed on the surface of the ground, was in a straight line along the northwest boundary of the patented tract, and was within 50 feet of said line. The surface tract covered by the patent, except said 50 feet, was on the southeast side of said lode, and extended about three-quarters of a mile therefrom. Under the rules and regulations of the mining district where said lode was situated, the locator was entitled to only 100 feet of ground on each side of the lode; and, under the laws of the United States (Rev. St. § 2320), the amount of surface is restricted to 300 feet. The question there was whether, by virtue of the surface ground, the owner of the mining claim could include real estate within the surface boundaries situated more than 300 feet distant from the lode. Upon the facts the court held that under the provision of section 2320, Rev. St. U. S., the land department had no jurisdiction, power, or authority to issue a patent to a quartz lode for any surface ground exceeding 300 feet in width on each side of the middle of the vein or lode, and that any patent that is issued for more than that amount of surface ground is absolutely null and void as to the excess over 300 feet, and that the patent might be collaterally attacked in a court of law. It will thus be seen that there were no principles of law involved in those cases which have any application whatever to the case at bar. In this case the plaintiff in error does not claim any right whatever to the surface boundaries of the North Star claim, as patented; and it is a well-settled and elementary principle of law that the possession of this surface ground by the defendant in error is sufficient evidence of title, as against any one not showing any higher or better right thereto. Moreover, even if the principles of the Lakin Cases could be considered, remotely or otherwise, as having any application to the present

case, still the defendant in error would be entitled to the vein or lode, which was proved and established in this case, and to the surface ground for 300 feet on each side of the center of the lode; and this is all that is required to give the party the extra rights which are provided for by the statute.

3. The plaintiff in error contends that, if the patented area of the North Star is to be considered as a location, its end lines are not parallel, as found by the court, and that under section 2320, Rev. St., the defendant in error possesses no extralateral rights under it. The act of 1866, under the provisions of which the patent in this case was applied for, and under which the rights of defendant in error accrued, did not require parallelism of end lines. Walrath v. Mining Co., 63 Fed. 552, 556. Under this act, "however tortuous might be the course of the lode, the claimant had a perfect right to follow it up, and prepare his diagram so as to include it, together with the surface ground on each side thereof allowed by local laws. There is no language in the act that requires the diagram to be in the form of a parallelogram, or in any other particular form." Wolfley v. Mining Co., 4 Colo. 112, 116. Moreover, the end lines, as marked on the diagram, converge in the direction of the dip; giving the patentees less of the vein or lode, in depth, than they had at the surface. The object of the act of 1872 in requiring parallelism of end lines was intended to give to the claimant of the lode as much of the lode or vein in its downward course as he has at the surface, but no more. It appears from the findings that the defendant in error was only allowed 2,200 feet of the apex of the lode, because it was cut off on the west by a "crossing," as shown on the diagram. The restriction of its rights in these particulars cannot be complained of by the plaintiff in error.

From any legal standpoint from which the facts of this case can be considered, it is apparent that the judgment of the circuit court in favor of the defendant is correct. The judgment of the circuit court is affirmed, with costs.