[Sac. No. 1095.   Department One.—February 1, 1905.]

CENTRAL EUREKA MINING COMPANY, Respondent, v. EAST CENTRAL EUREKA MINING COMPANY et al., Defendants; JAMES TOMAN and ELIZA A. TOMAN, Appellants.

MINES—LOCATION OF QUARTZ CLAIM PRIOR TO MAY 10, 1872—END-LINES NOT PARALLEL—EXTRALATERAL RIGHTS.—Although in cases of location of quartz claims made after May 10, 1872, the end-lines of the location must be parallel in order to secure extralateral rights, yet, by the terms of the act of May 10, 1872, in preserving rights previously acquired, in cases of location made prior to that act, extralateral rights are preserved though the end-lines of the location are not parallel.

ID.—PRIOR APPLICATION FOR PATENT—PAYMENT AND ISSUANCE UNDER ACT OF 1872 — RECITAL — EXTRALATERAL RIGHTS NOT WAIVED.— Where a patent was applied for under the act of July 26, 1866, as amended July 9, 1870, for quartz claims located prior to those acts, the fact that payment was made and the patent obtained under the act of May 10, 1872, does not show a waiver of extralateral rights on the original vein located because the end-lines were not parallel, where the patent recites that it was made in pursuance of each of said acts, and upon an application pending when the act of 1872 was passed.

ID.—QUITCLAIM DEED TO AGRICULTURAL PATENTEES—PRIOR MINING PATENT—DIP OF QUARTZ VEIN NOT CONVEYED.—A quitclaim deed by the owner of a patented quartz mine to the owner under subsequent agricultural patents, of a portion of certain sections of agricultural land described as lying east of the "patented mining ground known as the Summit Quartz Mine," etc., conveyed no interest in the dip of the patented quartz vein beneath the agricultural surface, which had been severed therefrom by the prior mining patent, and the severance of which had been recognized by corresponding limitations in the agricultural patents. The dip of the vein was as much a part of the patented quartz mine as the land within the surface lines of the location.

ID.—ACTION TO QUIET TITLE—EVIDENCE—QUITCLAIM DEED EXCLUDED. —In an action by the mine owners to quiet title to the quartz mine as against the owners of the agricultural land who were mining on the dip of the vein, beneath the surface of their lands, the quitclaim deed to them from the plaintiff was properly excluded from evidence, where it appeared from the surrounding circumstances accompanying its execution that there was no intention to convey any part of the quartz mine, and it did not purport to convey any part of the vein having its apex within the surface lines of the claim.

APPEAL from a judgment of the Superior Court of Amador County and from an order denying a new trial. R. C. Rust, Judge.

The facts are stated in the opinion of the court.

Campbell, Metson & Campbell, and Galpin & Bolton, for Appellants.

The quitclaim deed of December 31, 1898, conveyed all minerals beneath the surface of the land granted which were not expressly reserved. (2 Blackstone's Commentaries, 19; Civ. Code, sec. 659; *Moore* v. *Smaw,* 17 Cal. 199, 224;[1] *Moelle* v. *Sherwood,* 148 U. S. 21-29; *Carpentier* v. *Williamson,* 25 Cal. 154; *Graff* v. *Middleton,* 43 Cal. 341.) The end-lines not being parallel, the patent under the act of 1872 conveyed no extralateral rights. (*Iron Silver M. Co.* v. *Elgin M. and S. Co.,* 118 U. S. 196; *Del Monte M. and M. Co.* v. *Last Chance M. Co.,* 171 U. S. 66.) By accepting a patent under the act of 1872 the patentee waived all rights in conflict therewith. (*New Dunderberg M. Co.* v. *Old,* 79 Fed. 598; *Walrath* v. *Champion M. Co.,* 171 U. S. 293; *Lakin* v. *Dolly,* 53 Fed. 337; *Lakin* v. *Roberts,* 54 Fed. 461; 154 U. S. 507.)

Carter & Ricketts, *Amici Curiæ,* also for Appellants.

The quitclaim deed was a grant, and is to be interpreted in favor of the grantee, and subject to the rules for the interpretation of contracts. (Civ. Code, secs. 1053, 1066, 1069, 1636, 1638, 1641, 1643, 1644, 1647, 1649, 1652, 1654; Code Civ. Proc., secs. 1858, 1860, 1864.) It passed all the grantor's rights not expressly reserved by the terms of the instrument. (20 Am. & Eng. Ency. of Law, 2d ed., p. 768; *Graff* v. *Middleton,* 43 Cal. 343, 344, and cases in which it has been approved and followed; *Frey* v. *Clifford,* 44 Cal. 343; *Rego* v. *Van Pelt,* 65 Cal. 256; *Nidever* v. *Ayers,* 83 Cal. 42; *Spaulding* v. *Bradley,* 79 Cal. 456; *Taylor* v. *Opperman,* 79 Cal. 470; *Davidson* v. *Coon,* 125 Ind. 503; *Smith* v. *McClain,* 146 Ind. 84; *Schott* v. *Dosh,* 49 Neb. 193;[2] *Wilhelm* v. *Wilken,* 149 N. Y. 452;[3] *Cutter* v. *James,* 64 Wis. 178.[4])

[1] 79 Am. Dec. 123.
[2] 59 Am. St. Rep. 536.
[3] 52 Am. St. Rep. 746.
[4] 54 Am. Rep. 606.

Olney & Olney, and Curtis H. Lindley, for Respondent.

The patented title related back to the original locations in 1863 and 1865, when the location of the vein was the principal thing and the surface location the incident, which was recognized by the act of July 26, 1866, under which the application for a patent was made. (*Jennison* v. *Kirk*, 98 U. S. 453; 456; *Broder* v. *Natoma Water Co.*, 101 U. S. 274, 276; *Chambers* v. *Harrington*, 111 U. S. 350, 352; *Northern Pac. R. R. Co.* v. *Sanders*, 166 U. S. 634; *Del Monte M. and M. Co.* v. *Last Chance M. Co.*, 171 U. S. 55, 64; *Johnson* v. *Parks*, 10 Cal. 447, 449; *Eclipse G. and S. M. Co.* v. *Spring*, 59 Cal. 304, 305; *Patterson* v. *Hitchcock*, 3 Colo. 533, 534; *Wolfley* v. *Lebanon M. Co.*, 4 Colo. 112, 116; *Walrath* v. *Champion M. Co.*, 63 Fed. 552, 556; 171 U. S. 293; *Eureka Case*, 4 Saw. 302, 323.) Parallelism of end-lines was not required under the act of 1866, though extralateral rights were expressly given. (*Argonaut M. Co.* v. *Kennedy M. Co.*, 131 Cal. 15, 25;[1] *Richmond M. Co.* v. *Eureka M. Co.*, 4 Saw. 302, 319; 103 U. S. 839, 847; *Iron Silver M. Co.* v. *Elgin M. and S. Co.*, 118 U. S. 196, 208; *Consolidated Wyoming M. Co.* v. *Champion M. Co.*, 63 Fed. 540, 542; *Carson City G. and S. M. Co.* v. *North Star M. Co.*, 73 Fed. 597, 599; 83 Fed. 658, 669.) Rights previously acquired were not impaired by the act of 1872, but were expressly reserved, and additional rights granted. (Act of 1872, secs. 9, 12, 16; *Eureka Case*, 4 Saw. 323; *Eclipse G. and S. M. Co.* v. *Spring*, 59 Cal. 304, 307; *Carson City G. and S. M. Co.* v. *North Star M. Co.*, 73 Fed. 597, 599.) The quitclaim deed as worded was not effective to pass any part of the quartz mine, or of the vein appertaining thereto, which was an integral part of the mine, by which the original land quitclaimed was bounded. The rights of quartz claimants have compelled a departure from common-law rules as to *cujus solum*. (*Bullion M. Co.* v. *Crœsus etc. M. Co.*, 2 Nev. 168;[2] Act of July 2, 1866; Act of May 11, 1872; *Doe* v. *Waterloo Min. Co.*, 54 Fed. 938, 945; *Eureka Case*, 4 Saw. 302; 103 U. S. 839; *Boston and M. Con. C. and S. Co.* v. *Montana Ore Purchasing Co.*, 89 Fed. 529, 550; *Tyler Min. Co.* v. *Last Chance M. Co.*, 90 Fed. 15, 25.)

ANGELLOTTI, J.—Defendants Toman appeal from a judgment quieting plaintiff's title to certain mining prop-

---

[1] 82 Am. St. Rep. 317.       [2] 90 Am. Dec. 526.

erty and from an order denying their motion for a new trial. The plaintiff is the owner of the Summit Quartz Mine, situated in Amador County, and the controversy here is as to so much of the vein of ore having its apex within the surface lines of plaintiff's location as lies within vertical planes drawn through the end-lines of such location and those lines produced in their own direction, and underneath the surface of defendant's land. This vein at the apex traverses plaintiff's location, crossing both the southern and northern end-lines. In its downward course the vein descends into the earth at an angle approximately of sixty-five degrees eastwardly, and on such downward course passes outside of a plane drawn down vertically through the east side-line of plaintiff's surface location, and enters the adjoining land of defendants at a depth of 1,094 feet from the collar of plaintiff's shaft, and extends for a considerable distance therein. Plaintiff has already sunk its shaft to a depth of about two thousand feet, and was at the time of the commencement of this action engaged in removing the ore and mineral-bearing rock from said vein, at such depth of about two thousand feet.

The end-lines of plaintiff's claim are not parallel, but converge in the direction of the dip of the vein.

Plaintiff's title to the Summit Quartz Mine is derived from Hall McAllister, the patentee from the United States. The patent was issued November 25, 1873, and the final entry and payment were made on October 11, 1872, several months after the passage of the act of Congress of May 10, 1872, relative to the promotion of the development of the mining resources of the United States.

The application for the patent, based upon two locations made in the years 1863 and 1865, respectively, was filed on February 7, 1871, while the act of July 26, 1866, commonly known as the "Lode and Water Law," was in force, and was pending on May 10, 1872, awaiting the approval of the surveyor-general of the survey which had already been made and submitted for approval. The patent subsequently issued upon said application purported to grant to the patentee the mining premises described therein, with the exclusive right of possession and enjoyment of 1165 56/100 linear feet of said vein (the length thereof on the apex between plaintiff's end-lines) throughout its entire depth, although it might enter

the land adjoining, provided that the right of possession thereby granted to any portion of the vein outside of the vertical side-lines of the survey should be confined to such portions thereof as lay between vertical planes drawn downward through the end-lines of said survey at the surface, so continued in their own direction that such vertical planes will intersect such exterior parts of such vein. The patent recites that the proceedings were had in pursuance of the act of July 26, 1866, the act amendatory thereof, approved July 9, 1870, and the act of May 10, 1872, and that the patent is issued in conformity with said acts.

The defendants own the adjoining land, known as the Toman Ranch, their title being derived through mesne conveyances from patents issued under the laws of the United States providing for the sale and disposition of agricultural lands, which patents were junior in point of time to the patent for the Summit Quartz Mine, and contained a reservation giving the right to the proprietor ''of a vein or ledge to extract and remove his ore therefrom should the same be found to penetrate or intersect the premises hereby granted.''

It will be seen from the foregoing that the mining patent purported upon its face to grant to plaintiff's predecessor all that portion of the vein of ore which is here in controversy.

Defendants contend, however, that notwithstanding the attempted conveyance in terms of the property in dispute, the patent failed to convey any extralateral rights, by reason of the fact that the end-lines of plaintiff's claim, as located, surveyed, and granted, were not parallel, as required by the act of May 10, 1872.

It appears to be recognized by the authorities that compliance with the requirements of the act of May 10, 1872, that the end-lines shall be parallel, is essential to the existence of any right in the locator or patentee to follow his vein outside of the vertical planes down through the side-lines, in all cases where the location was made under such act. (*Iron S. M. Co.* v. *Elgin M. and S. Co.,* 118 U. S. 196; *Del Monte M. and M. Co.* v. *Last Chance M. and M. Co.,* 171 U. S. 55; *Argonaut M. Co.* v. *Kennedy M. and M. Co.,* 131 Cal. 15, 25.[1])

Plaintiff urges that, as the only object of such requirement was to prevent the locator in following his vein downward

[1] 82 Am. St. Rep. 317.

from acquiring a greater length underneath the surface than he had apex at the surface, a grant of extralateral rights within *converging* end-line planes, as in this case, would be within the spirit and intent of the act of 1872, and therefore valid. This view is opposed to statements made in the opinions in the cases last cited, which appear to incline to the conclusion that extralateral rights are granted under the act of 1872 only when the end-lines are parallel. However, it is unnecessary to definitely decide this point in this case, for we are satisfied that, as the locations upon which the patent was based were made prior to May 10, 1872, the requirement as to parallelism of end-lines was not applicable thereto. It was not until the passage of the act of 1872 that there was any such requirement, and it is not disputed that had the patent issued prior to the passage of such act, it would have conveyed the extralateral right between the converging end-planes. While the act of May 10, 1872, repealed the previous statutes regarding the location and patenting of mining claims of the character here involved, the framers thereof were very careful to manifest their intention that existing rights should not be affected by such repeal. By section 2322 of the Revised Statutes (one of the sections of said act), it was declared that "The locators of all mining locations heretofore made, . . . so long as they comply with the laws of the United States, and with state, territorial, and local regulations not in conflict therewith, shall have the exclusive right of possession and enjoyment of all the surface included within the lines *of their locations,* and of all veins, lodes, and ledges throughout their entire depth, the top or apex of which lies inside of such surface lines extended downward vertically, although such veins, lodes, or ledges may so far depart from a perpendicular in their course downward as to extend outside the vertical side-lines of such surface locations," provided that their right of possession to such outside parts of such veins shall be confined between vertical planes drawn downward through the end-lines of their locations, continued in their own direction. It was further expressly provided in the act that "Such repeal shall not affect existing rights. Applications for patents for mining claims now pending may be prosecuted to a final decision in the general land office, but in such cases, where adverse rights are not affected thereby, patents may issue

in pursuance of the provisions of this act," and further, "Nor shall this act affect any right acquired under said act" (the act of 1866), and still further, "Provided that nothing contained in this act shall be construed to impair in any way rights or interests in mining property acquired under existing laws." In the face of such provisions, it cannot be held that it was the intention of Congress to deprive a previous locator by any new requirement of any existing right, unless such intention is very clearly manifested. So far as the particular requirement as to parallelism of end-lines is concerned, it would appear to be well settled that it has no application to locations made prior to the act of May 10, 1872. The objection of want of parallelism in end-lines, where the patent was issued subsequent to the passage of said act, based upon locations made prior thereto, has been several times disposed of by the simple statement that when the locations were made there was no law requiring such parallelism. (See *Carson City G. and S. M. Co.* v. *North Star M. Co.*, 73 Fed. 597, 599; 83 Fed. 658, 669.) In *Iron S. M. Co.* v. *Elgin M. and S. Co.*, 118 U. S. 196, 208, the supreme court of the United States said, in effect, that a locator under the act of 1866 has in such a case extralateral right, notwithstanding the lack of parallelism. The question was fully considered and definitely decided by this court in favor of such right in *Argonaut Min. Co.* v. *Kennedy M. and M. Co.*, 131 Cal. 15. It was said therein that it would have been competent for Congress in the law of 1872 to have required parties who had equitable rights to patents to have made their end-lines parallel before a patent issued, on pain of losing all extralateral rights, but there were no such provisions in the act of 1872, and that the rights of locators under former laws were by said act expressly confirmed to them. The extralateral right was in that case confirmed, although the end-lines diverged, it being held that it could be determined as matter of law from the patent what portion of the vein between those lines, not exceeding at any depth the stated number of linear feet at the apex, was conveyed. Where the end-lines converge, as in this case, there can, of course, be no question as to the definiteness of the description of the extralateral right conveyed. By reason of such converging, the patentee is confined, within well-defined boundaries, to less on the dip below the surface than he had upon the surface.

It is sought to distinguish this case from the Argonaut case and other cases relied on by plaintiff, by showing that in all these cases the applicant for a patent had made his application and paid his money thereon, prior to the passage of the act of May 10, 1872, and thereby had acquired an equity susceptible of enforcement against the government, while in the case at bar, although the locations and application for a patent had been made prior to May 10, 1872, the payment was not made or the survey finally approved by the surveyor-general until after that date. We find nothing in the report of the case of *Carson City* v. *North Star etc. Co.*, 73 Fed. 397, 599; 83 Fed. 658, 669, showing that the money had been paid prior to May 10, 1872, and, so far as appears therein, the case was an exact parallel to this case.

We are, however, of the opinion that the distinction alleged is not at all material. We are not concerned here with the question as to how far a locator must have proceeded with his claim to put it beyond the power of the government to interfere with him in the enjoyment of the same. As we read the act of 1872, it seems very clear that it was the intention of Congress to preserve to the prior locator everything that his location would have given him had the act of 1872 not been enacted, except possibly the width of the claim on the surface. (See *Lakin* v. *Roberts,* 54 Fed. 461.)

We have already referred to the various provisions upon this subject contained in the act of 1872, and it is unnecessary to here restate them.

The rights sought by the act to be preserved were such rights as had been acquired under the prior acts, by the making of a valid location, even though those rights were not of such a nature that the government might not, if it had seen fit so to do, deprive the locator thereof, and the right to obtain a patent in accordance therewith, under the provisions of the act of 1872, was given for the reason that the previous laws as to the issuance of such patents were repealed, and there was no other law under which a patent could be issued for any such mining claim. It was left to the land department to determine, as to any such alleged prior location, what the rights of the locator were under the previous acts, and, in accordance with the procedure laid down by the act of 1872, to issue a patent conveying the title of

the government so far as might be necessary to effectuate such rights.

The patentee did not waive or renounce any extralateral right by the acceptance of the patent. It is true that the patent did, in accordance with the express provisions of the act of 1872, purport to grant in addition to the vein or lode originally located the right to *all* other veins or lodes, the top or apex of which lay inside of· the surface lines of the location extended downward vertically to their entire depth, although in their course downward they extended outside of the vertical side-lines. It might perhaps be contended with some force that as to these other veins and lodes, which were not embraced within the original location, and the right to which was for the first time given by the act of 1872, the requirement as to parallelism of end-lines might preclude any extralateral right. But the patent in terms also purported to grant the 1165 56/100 linear feet of the original vein, throughout its entire depth, between the end-lines continued in their own direction. By the acceptance of such a patent, there was no indication of any intent to waive or renounce any right to follow the vein between the end-lines given by the original location, for those rights were expressly confirmed thereby, and plaintiff bases its claim entirely thereon. We cannot see that the legal effect of such an acceptance was a waiver or renouncing of any such right. These particular rights the patentee was entitled to, even though his end-lines were not parallel, and the fact that the patent purported to also grant something ·else to which he·may not have been entitled cannot affect his rights as to the original vein, which are also confirmed by the patent.

It is true that the patent recites on its face that it is issued in pursuance of the act of 1872, but it also recites that it is issued in pursuance of the act of July 26, 1866, and the act amendatory thereof, approved July· 9, 1870, and, in conjunction with the public records in evidence, shows that it was issued upon locations made prior to May 10, 1872, and upon an application pending at that date.

The decision in the case of *New Dunderberg M. Co.* v. *Old,* 79 Fed. 598, relied upon by appellants, does not sustain their claim. The Dunderberg owners claimed the right to follow their vein on its *course,* or *strike,* outside of and beyond

their patented boundaries and into a prior claim (the Frost-berg). They claimed that they had this right under the act of 1866, but they had so located their claim on the surface that the lode crossed both side-lines of the claim diagonally on its strike, and passed out of the claim more than three hundred feet before it entered the Frostberg claim, and had accepted a patent for this location. This patent did not purport to grant the extralateral right alleged, and could not under the law grant it upon the surface location, which had to be made under either act, for under both acts the locator was confined, in following the *strike* of his vein, within the surface boundaries he had himself defined. To include the extralateral right sought in that case, it was necessary for the Dunderberg owners to go beyond their location, entry, and patent, and claim something not embraced therein at all. It was in regard to such a case that the circuit court of appeals said that the claimant was bound by his own location, entry, and application, and a patent in accordance there-with, and that his location and entry for a patent was a notice of abandonment of everything not included therein. It was said: "A claimant who discovered and located a lode mining claim under the act of 1866 renounces and abandons all rights and privileges to follow his lode *on its course* beyond the exterior lines of his patented claim when he located it upon the surface of the ground, enters it, and accepts a patent for it under the act of May 10, 1872." Since the side-lines of the Dunderberg claim crossed the course of the strike of the vein, they were held to constitute end-lines, and it was held that under the express terms of the patent the owner of the claim was without right to the possession of the lode outside of those lines after he obtained his patent. This case is in no way applicable here.

A question is raised as to the effect upon plaintiff's extra-lateral right of a quitclaim deed made by plaintiff to the defendants Toman on December 31, 1898.

By this deed plaintiff purported to remise, release, and for-ever quitclaim unto the Tomans "All those certain lots, pieces, or parcels of land situate, lying, and being in the said county of Amador, state of California, and bounded and particularly described as follows, to wit: First, That portion of sec-tions eight (8) and seventeen (17), township six (6) north,

range eleven (11) east, Mount Diablo base and meridian, lying north of the center of that certain wagon-road extending between the towns of Ione and Volcano and known as the Ione and Volcano wagon-road, and lying east of that certain patented mining ground known as the Summit Quartz Mine, and also east of that certain patented mining ground known as the Amador Consolidated Mine." The second parcel described lay to the west of the Summit Quartz Mine, and is in no way here involved. By this deed the plaintiff further purported to remise and release the Tomans from all claims, bonds, and contracts made by the Tomans to it or its predecessors, and specially from any covenant contained in an agreement between the parties, dated October 23, 1897, and duly recorded.

The deed recited that it was made pursuant to a resolution of the board of directors adopted December 31, 1898. The making of the deed was subsequently ratified by two thirds of the stockholders.

The objection made by plaintiff when defendants offered this deed in evidence was sustained, and the deed excluded upon the ground, as stated by the court, that it did not purport to convey any portion of the mining ground of plaintiff.

Admittedly, the description in the deed does include the land of the Tomans adjoining plaintiff's claim, through which the vein in controversy has its dip. Defendants, relying upon the well-recognized principle that a conveyance of land, in the absence of express reservation, carries not only the surface of the earth but everything under it and over it, including the minerals therein contained, claim that the effect of this deed was to convey to defendants the portion of the vein here in dispute. As the plaintiff was at the date of the deed the owner of such portion of said vein, such must be held to be the effect of the quitclaim deed if the description in the deed includes the same.

As has already been seen, the deed purported to convey only such portions of the sections of land as lay east of "that certain patented mining ground known as the Summit Quartz Mine and also east of that certain patented mining ground known as the Amador Consolidated Mine." It is only by construing this language as referring exclusively to the lines

of the surface location that defendants' contention that this description included the vein can be upheld. As a matter of fact, the vein under the Toman surface was, so far as it lay between the converging end-line planes of plaintiff's claim, as much a part of the Summit Quartz Mine, and of the patented mining ground known as such mine, as was the land within the surface lines of plaintiff's location. (*Tyler Min. Co.* v. *Last Chance M. Co.,* 90 Fed. 15, 21; *Empire State etc. Co.* v. *Bunker Hill etc. Co.,* 121 Fed. 973-977; *Davis* v. *Shepherd,* 31 Colo. 141.)

It had been by the United States government severed from the Toman land, and granted to plaintiff's predecessor, as an integral part of the Summit Quartz Mine, and the agricultural patents of defendants' predecessors contained a corresponding limitation upon the estate granted to them.

Unquestionably, it would have been conveyed by any instrument purporting to grant the Summit quartz-mining claim, or the Summit quartz-mining ground, for it was part and parcel thereof. The reasons which would require us to hold that the vein was conveyed by a deed purporting to convey the Summit Quartz Mining Claim or Mining Ground are equally applicable to a deed purporting to convey only lands lying east of such claim or ground, and forbid the conclusion that it was intended to convey any part of the mining claim or ground itself.

A very different case would be presented if we were dealing with a deed which contained a description of a parcel of land simply by metes and bounds, or a deed which purported to convey all lands lying east of a certain defined surface line. We have no such deed here, but one which in terms limits its operation to such portions of the designated sections as lie east of the "mining ground," of plaintiff. Taking into consideration simply the character of plaintiff's property, we are of the opinion that the deed did not purport to convey any portion of any vein that had its apex within the surface lines of plaintiff's location, so far as it lay between the converging end-lines of plaintiff's claim.

When we examine the deed in the light of the circumstances surrounding its execution, as disclosed by the evidence introduced by defendants, it is apparent that there was no intention to convey any part of the mining claim.

The resolution of the board of directors of plaintiff authorizing the execution of the deed, which is referred to in the deed, and the instrument of ratification signed by the stockholders of plaintiff, show that the object of the quitclaim deed was to free the land and title of the defendants from the effect of a contract made on October 23, 1897, by the Tomans and plaintiff, whereby the Tomans had agreed to sell and convey to plaintiff their lands adjoining plaintiff's claim. It appears from the resolution of the board of directors that the Tomans, owning the agricultural lands lying east of plaintiff's claim, had agreed to sell and convey to plaintiff, the owners of the Summit Quartz Mine, certain real property, the description being apparently the same as that in the quitclaim deed, and that it had been mutually agreed that the agreement should be canceled, the plaintiff to pay the Tomans one thousand dollars in consideration of such cancellation, and the president and secretary were authorized to execute on behalf of the corporation "a quitclaim deed of all the right, title, and interest of the corporation in and to the *real property described in said contract of sale,* and particularly described as follows." Then follows the description contained in the deed. The ratification by the stockholders recites the execution to the Tomans of "a quitclaim deed conveying all their right, title, and interest of said corporation in and to the *property described in said contract,"* and ratifies such a deed.

It is very clear that it was not the intention of either directors or stockholders to remise or release or quitclaim any interest of plaintiff in or to anything that was not covered by the agreement of sale executed by the Tomans. The manifest object was to place the Tomans, so far as title was concerned, exactly where they were at the date of the execution of the agreement of sale. Only *"the property described in said contract"* was to be quitclaimed. The only property described in said contract of sale was property adjoining plaintiff's mining claim. No part of such mining claim was included therein.

We are therefore of the opinion that there was no error in refusing to receive the deed in evidence for the reason that, quitclaiming only lands lying east of the "mining ground known as the Summit Quartz Mine," it did not pur-

port on its face to affect any portion of plaintiff's mining claim, and there is nothing in the surrounding circumstances shown by the evidence introduced by defendants, conceding that the language of the deed is such as to justify consideration of those circumstances, that would justify such a construction of the deed as would make it a conveyance of any portion of plaintiff's interest in its mining claim.

The judgment and order are affirmed.

Shaw, J., and Van Dyke, J., concurred.

Hearing in Bank denied.